```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/15/13
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SUSANA MARTINEZ, NINNETTE              :
JUSTINIANO, JULIA FAZYLOVA,            :
CAROL STANBERRY, and LORRAINE          :
THOMAS,                                :
                                       :
                    Plaintiffs,        :
                                       :
            -v.-                       :
                                       :
HILTON HOTELS CORP., SUNSTONE HOTEL    :
PROPERTIES, INC., and INTERSTATE       :
HOTELS & RESORTS, INC.,                :
                                       :
                    Defendants.        :
-------------------------------------------------------------x

OPINION AND ORDER

10 Civ. 7688 (JLC)

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiffs Susana Martinez ("Martinez"), Ninnette Justiniano ("Justiniano"), Julia

Fazylova ("Fazylova"), Carol Stanberry ("Stanberry"), and Lorraine Thomas ("Thomas")

(collectively, "Plaintiffs"), present and former housekeeping personnel at the Hilton Times

Square, bring this case under the Fair Labor Standards Act ("FLSA") and New York Labor Law

("NYLL") seeking unpaid overtime and "spread of hours" compensation.  Defendants Sunstone

Hotel Properties, Inc. ("Sunstone") and Interstate Hotels & Resorts, Inc. ("Interstate")

(collectively, "Defendants") have moved for summary judgment on the asserted basis that

Plaintiffs were overtime-exempt "executives" under the FLSA and NYLL.  In the alternative,

Defendants seek partial summary judgment that the proper method for computing any overtime

compensation due to Plaintiffs is the United States Department of Labor's "half-time" method,

and that Plaintiffs are not entitled to "spread of hours" pay under NYLL because their

compensation exceeded the minimum wage.  For the reasons set forth below, Defendants'

motion for summary judgment is denied, and their motion for partial summary judgment is granted in part and denied in part.

## I.     BACKGROUND

**A.     Facts[1]**

During the relevant time period, Fazylova, Justiniano, Stanberry, and Martinez were employed as Housekeeping Managers at the Hilton Times Square ("Hotel"), and Thomas was employed as an Assistant Housekeeping Manager. Def. 56.1 ¶¶ 1-5.[2] Sunstone owns the Hotel and managed its operations from March 17, 2006 through April 1, 2011, when another company took over operations and became the employer of the Hotel's employees. Def. 56.1 ¶¶ 6, 8. Interstate is Sunstone's parent corporation, Def. 56.1 ¶ 9, and according to Plaintiffs, employed

---

[1]     The facts set forth below are taken from the Amended Complaint ("Am. Compl.") (Dkt. No. 19); Defendants' Local Civil Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue to be Tried ("Def. 56.1") (Dkt. No. 37); Plaintiffs' Local Civil Rule 56.1 Statement ("Pl. 56.1") (Dkt. No. 41); and deposition excerpts and documentary evidence filed as exhibits to the Declaration of Howard M. Wexler, Esq. ("Wexler Decl.") (Dkt. No. 40), the Declaration of Brian M. Moss ("Moss Decl.") (Dkt. Nos. 41-44), and the Reply Declaration of Howard M. Wexler, Esq. ("Wexler Reply Decl.") (Dkt. No. 46). Where the facts are undisputed, the Court cites only to Defendants' Rule 56.1 statement, meaning that the cited paragraph is admitted in the corresponding paragraph in Plaintiffs' Rule 56.1 statement. Where material facts are disputed, the Court identifies that to be the case, construes the facts in the light most favorable to Plaintiffs, and cites to specific Rule 56.1 paragraphs and record evidence supporting the existence (or nonexistence) of the disputed fact.

[2]     Fazylova, Justiniano, Martinez, and Stanberry were each hired as Housekeeping Managers between 2000 and 2002. Am. Compl. ¶¶ 5-8; Wexler Decl. Ex. I at 14-15. Thomas was hired as a Room Attendant in 2001, became an Office Coordinator in 2004, and an Assistant Housekeeping Manager in 2009. Def. 56.1 ¶ 5; Moss Decl. Ex. UUU. Thomas and Martinez continued to work for the Hotel through the filing of the Amended Complaint in February 2011. Am Compl. ¶¶ 5, 9. Stanberry, Justiniano, and Fazylova each ceased working for the Hotel in 2010. Id. ¶¶ 6-8.

Thomas and Martinez from approximately July 2010 until April 1, 2011. Am. Compl. ¶ 15; Pl. 56.1 ¶ 9; Wexler Decl. Ex. E at 21.[3]

      1.     Structure of the Housekeeping Department

          a.     Structure of the Department from 2006 until 2009

From March 17, 2006 through October 31, 2009, the Hotel's housekeeping department consisted of Room Attendants and Housemen (the number of which is not specified in the record), ten or eleven Housekeeping Managers, six Office Coordinators, and a Housekeeping Director. See Def. 56.1 ¶¶ 10-12, 15; Wexler Decl. Ex K at 16-17. Room Attendants and Housemen were hourly, overtime-eligible employees represented by Local 6 of the Hotel Employees & Restaurant Employees International Union. Def. 56.1 ¶ 20; Moss Decl. Ex. P. Room Attendants were responsible for cleaning 14 rooms per shift. Def. 56.1 ¶¶ 14, 16-18. Housemen performed such work as picking up dirty linens and cleaning the common areas. Def. 56.1 ¶ 19.

Housekeeping Managers were non-union, salaried employees whom Defendants treated as overtime-exempt. Def. 56.1 ¶ 13. Housekeeping Managers inspected and oversaw cleaning and related work performed by the Room Attendants and Housemen. Def. 56.1 ¶ 34; Moss Decl. Ex. A. Office Coordinators were non-union, hourly employees whom Defendants treated as overtime-eligible. Moss Decl. Exs. RRR, UUU. Office Coordinators performed administrative office work such as staffing, dispatching assignments, scheduling, payroll, guest requests, processing paperwork, and answering the phone in the housekeeping office. Moss Decl. Exs. V, XXX. Office Coordinators also performed room inspections, and according to one of their

---

[3]     A third defendant, Hilton Hotels Corporation, was dismissed from the case with prejudice by stipulation of the parties on January 5, 2012. (Dkt. No. 33).

supervisors, "pretty much did everything, just like the housekeeping managers." Moss Decl. Ex. V (Slavka Kmec Tr. at 21) (acting Housekeeping Director).

The Housekeeping Director was a salaried employee who headed the department and was responsible for "employ[ing] the team for the housekeeping department" and manag[ing] the daily operations, including purchasing, budgeting, and all other management functions." Wexler Decl. Ex. I at 13; see also Moss Decl. Ex. A (listing general duties), Ex. GGG (housekeeping director responsible for "efficient running of the department"). The Director was the only employee in the department who wore professional clothing to work. Wexler Reply Decl. Exs. B, C.

b.    Restructuring of the Department in 2009

In October 2009, the Hotel eliminated the Office Coordinator position and replaced it with an overtime-exempt Assistant Housekeeping Manager position. Moss Decl. Exs. LLL, QQQ. Plaintiffs' superiors testified that this change was made in order "to eliminate overtime," put "more people on the floors," and get "more work for the cost [the Hotel] was paying" to its housekeeping employees. Moss Decl. Exs. LLL, QQQ, SSS. Assistant Housekeeping Managers had similar responsibilities to the Housekeeping Managers. Def. 56.1 ¶ 58; Pl. 56.1 ¶ 58; Wexler Decl. Ex. E at 68-69; Moss Decl. Ex. SSS.[4]

2.    Plaintiffs' Duties

During the relevant time period, the Hotel's 22 guest floors and 460 guest rooms were divided into five sections for housekeeping purposes. Def. 56.1 ¶¶ 14, 16. There were two to four Housekeeping Managers on duty at a time, each charged with overseeing the cleaning of

---

[4]    The parties agree that responsibilities of the Housekeeping Managers and Assistant Housekeeping Managers were largely the same, Def. 56.1 ¶ 58, and the minor differences reflected in the record do not warrant an independent discussion of the positions. Accordingly, the Court generally uses the term "Housekeeping Manager" herein to encompass both positions.

one or more of these sections. Moss Decl. Ex. AA. Housekeeping Managers began their work
day in the housekeeping office, where they selected two rooms to designate as the sales
department's "show rooms" for the day and printed out several reports, including the daily work
assignments for the Room Attendants and Housemen, a report designating rooms as VIP, Hilton
Honors, or Quality Assurance rooms (special rooms that received extra amenities and cleaning),
and lists reflecting the number of clean, dirty, occupied, and unoccupied rooms for that day.
Def. 56.1 ¶¶ 23, 27, 28; Pl. 56.1 ¶¶ 23, 28; Moss Decl. Ex. U.[5] If any of the Room Attendants or
Housemen were absent, or if there were an unusually large number of rooms to be cleaned,
Plaintiffs might contact the Housekeeping Director to request additional coverage. Def. 56.1 ¶
24; Moss Decl. Exs. W, X. The Housekeeping Director made the final decision regarding any
staffing modifications, and also authorized any overtime necessitated thereby. Pl. 56.1 ¶ 24;
Moss Decl. Ex. W.

At the beginning of the day, Plaintiffs also prepared cleaning supplies for the Room
Attendants and Housemen, which consisted of cutting rags, obtaining buckets, mops, garbage
bags, dusters, and linens from the supply closet, and putting cleaning chemicals into bottles.
Def. 56.1 ¶ 25; Pl. 56.1 ¶ 25; Moss Decl. Exs. T, X, Z. On a rotating basis, Plaintiffs were
designated by the Hotel's human resources department to lead the "daily huddle," which was a
ten-minute meeting with the cleaning staff to discuss work assignments and safety topics. Def.
56.1 ¶ 29; Pl. 56.1 ¶ 29; Moss Decl. Ex. CC; Wexler Decl. Ex. J at 80. According to Plaintiffs,
leading the daily huddle consisted of little more than reading an email from the human resources
department to the housekeeping staff. Pl. 56.1 ¶ 29; Moss Decl. Ex. CC.

---

[5]    Defendants contend that Plaintiffs themselves assigned work to the cleaning staff, while
Plaintiffs describe their role as simply printing assignment information off of a computer and
distributing it. Def. 56.1 ¶¶ 23, 28; Pl. 56.1 ¶¶ 26, 30; Moss Decl. Exs. U, AA. For purposes of
this motion, the Court credits Plaintiffs' description.

Plaintiffs subsequently went to the floors of the Hotel, where they spent the majority of their work day. Def. 56.1 ¶ 30; Pl. 56.1 ¶ 30; Moss Decl. Exs. BB, QQQ. They first cleaned and/or inspected the show rooms and VIP rooms to make sure they were "perfect," which could take up to an hour per room. Def. 56.1 ¶ 32; Pl. 56.1 ¶ 32; Moss Decl. Ex. BB.[6] Then Plaintiffs began the work of inspecting the ordinary rooms to ensure that they had been sufficiently cleaned by the Room Attendants in conformity with the Hilton Standard on Cleanliness. Def. 56.1 ¶¶ 33, 34; Pl. 56.1 ¶ 34.[7] One of Plaintiffs' supervisors suggested that this was Plaintiffs' "most important[]" duty. Wexler Decl. Ex. O at 97.

The parties dispute what Plaintiffs' inspection duties entailed. Defendants contend that if a room had not been sufficiently cleaned by the assigned Room Attendant, Plaintiffs were supposed to "call back" the Room Attendant, point out the observed deficiencies, and direct the Room Attendant to remedy them. Def. 56.1 ¶¶ 36, 38. Alternatively, if the deficiencies were minor, Defendants acknowledge that Plaintiffs might perform any "touch up" cleaning themselves before releasing the room to the front desk for occupancy. Def. 56.1 ¶ 37. Defendants assert that Plaintiffs had the "discretion" as to whether to call back the Room Attendant or, in the alternative, to finish cleaning the rooms themselves. Def. 56.1 ¶ 38. However, Defendants insist that the general protocol was to call back the Room Attendant to fix the room, and that through the course of their inspections, Plaintiffs provided "direct coaching

---

[6]    There is some dispute as to whether Plaintiffs cleaned these rooms in the first instance, or merely inspected them after they had been cleaned by a Room Attendant. Def. 56.1 ¶ 32; Pl. 56.1 ¶ 32. The record suggests that Plaintiffs did both, depending on need. Moss Decl. Ex. BB.

[7]    The Hilton Standard on Cleanliness was set forth in a hard copy book, which described, inter alia, "how a room should be cleaned, dusted and vacuumed, that the sheets must be changed, the beds made, and the bathroom cleaned and washed." Pl. 56.1 ¶ 34; see also Moss Decl. Ex. FF.

and feedback" to the Room Attendants and Housemen, and "trained and retrained" the cleaning staff on the Hotel's cleaning expectations. Def. 56.1 ¶¶ 36, 41, 42.

Plaintiffs deny that they trained the Room Attendants and maintain that Room Attendants and Housemen were trained by other Room Attendants and Housemen. Pl. 56.1 ¶ 42. Plaintiffs also deny that they "coached" the Room Attendants and Housemen through their room inspections. According to Plaintiffs, they typically inspected rooms without the assigned Room Attendant present and rarely found the rooms to have been sufficiently cleaned. Pl. 56.1 ¶¶ 35, 42; Moss Decl. Ex. MM. Plaintiffs testified that time constraints did not permit them to "call back" the Room Attendant to re-clean the room without "dropping" rooms at the end of the shift. Moss Decl. Ex. GG. Thomas explained that Housekeeping Managers could "pull [Room Attendants] back one time . . .[or] twice. You can't pull them back three times because at the end of that day they are going to drop rooms on you." Id. Fazylova testified that Room Attendants "have their own assignments. Like fourteen rooms, if we're going to pull them many times, they're not going to be able to finish their room[s]. So that creates a problem for them to stay overtime." Moss Decl. Ex. HH. Plaintiffs also contend that they were specifically instructed by their supervisor "not to bother [the] Room Attendants too much," and to clean the rooms themselves to save time, minimize union issues, and cut down on overtime. Pl. 56.1 ¶¶ 36, 38, 43; Moss Decl. Ex. OO. As a result, Plaintiffs insist they spent the majority of their day "cleaning behind" the Room Attendants—meaning that they completed whatever tasks the Room Attendants overlooked, were unable to perform, or refused to perform. Pl. 56.1 ¶ 37; Wexler Decl. Ex. L at 139; Moss Decl. Ex. OO (Fazylova: 80 percent of day spent cleaning; Stanberry:

70 percent of day spent cleaning; Thomas: "whole entire day" spent "cleaning behind" the Room Attendants).[8]

Throughout the day, and interspersed with their inspection duties, Plaintiffs also communicated with the front desk regarding rooms ready to be released for occupancy, Def. 56.1 ¶ 35; Wexler Decl. Ex. N at 177; delivered additional supplies to Room Attendants, Wexler Decl. Ex. J at 103-04; assigned tasks to the Housemen pursuant to a schedule created by their supervisor, Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26; Moss Decl. Ex. AA; cleared the linen chute when it backed up, Pl. 56.1 ¶ 19; and sometimes addressed guest complaints such as "socks being left under the bed, hair in the bathrooms, missing irons and coffee makers that were not working," although Plaintiffs suggest that handling guest complaints was formally the responsibility of the Housekeeping Director. Def. 56.1 ¶ 44; Pl. 56.1 ¶ 44; Moss Decl. Ex. QQ. Defendants assert that Plaintiffs were also involved in budgeting, payroll, and purchasing supplies. Def. 56.1 ¶ 50. Plaintiffs deny this allegation and maintain that their supervisor handled the purchasing of supplies but "[e]ven the Housekeeping Director was not privy to the department's budget." Pl. 56.1 ¶¶ 49, 50; see also Moss Decl. Ex. II.[9]

---

[8]     When asked how frequently Room Attendants were not able to finish the rooms assigned to them, Fazylova responded "all the time" and explained that Housekeeping Managers "were told we have to help our room attendants to finish their rooms so we wouldn't have . . . problem with the overtime." Moss Decl. Ex. P. Stanberry testified that Housekeeping Managers sometimes worked without lunch breaks and after Room Attendants had gone home for the day because when Room Attendants "dropped" rooms, "we are the ones who have to end up cleaning the rooms" in order to "minimize the union issues" and "cut down on overtime." Moss Decl. Exs. O & P. Martinez testified that Housekeeping Managers were instructed by their supervisor to clean rooms themselves in the first instance (i.e., without the Room Attendant's participation)—and did so at least twice a week—"to improve the productivity for the room attendant." Moss Decl. Exs. M, P. Defendants contend, on the other hand, that cleaning was exclusively union work and "[n]one of Plaintiffs' supervisors ever instructed them to clean a room." Def. 56.1 ¶¶ 21, 43.

[9]     Defendants have submitted Plaintiffs' performance evaluations as evidence that they performed some of the disputed duties at issue in this case, such as training, payroll, budgeting,

3.    Plaintiffs' Management Authority

The parties agree that Plaintiffs were required to participate in management training, Def. 56.1 ¶ 55, but disagree as to the extent of Plaintiffs' management authority in practice. Defendants assert that when the Housekeeping Director was not in the Hotel, Plaintiffs were the highest ranking employees and assumed the Director's responsibilities. Def. 56.1 ¶ 57. Plaintiffs deny that they were ever in charge, Pl. 56.1 ¶ 57, and testified that they were closely supervised by the Housekeeping Director, whether she was in the Hotel or not. See Moss Decl. Ex. HHH ("[N]othing was moved or decide[d] in the hotel without [a supervisor's] authorization."); Ex. II ("Even if they [said] that I should manage my own situation without her assistance, everything had to go through [the director]."). Plaintiffs presented evidence that they were not allowed to change their shifts or leave at the end of the day without obtaining permission from the Housekeeping Director. Moss Decl. Exs. B, FFF.

The parties also dispute the degree of Plaintiffs' management authority over the Room Attendants and Housemen. Defendants assert that Plaintiffs could report performance issues to their supervisor, request that the Room Attendants and Housemen be retrained, and make recommendations regarding whether such employees should be disciplined, terminated, or, alternatively, recognized as an "employee of the month." Def. 56.1 ¶¶ 39, 40, 46, 47; Pl. 56.1 ¶¶ 46, 47, 54. In their depositions, Plaintiffs generally admitted that they could do these things, but denied it gave them any meaningful authority over the union employees. Moss Decl. Exs. SS,

---

and scheduling. See Wexler Decl. Exs. Q, S, T, AAA, FFF, GGG. However, as Plaintiffs point out, it is unclear from the record who drafted these evaluations. Pl. Mem. at 4. The witness who purportedly drafted them, one of the Housekeeping Directors, did not recall doing so. See Moss Decl. Exs. XXX, ZZZ. Moreover, Plaintiffs testified that they were instructed what to write in the self-evaluative portion of these appraisals (to the extent they wrote in them at all), and what they wrote was subsequently altered. Moss Decl. Ex. WWW. Therefore, the Court finds these evaluations to be of little evidentiary value.

TT, UU, WW. According to Plaintiffs, they could not write up or give verbal warnings to the Room Attendants and Housemen without permission from the Housekeeping Director. Pl. 56.1 ¶ 46; Wexler Decl. Ex. L at 149-51; Moss Decl. Ex. VV. Moreover, Plaintiffs maintain that when they did report employees to the Director for disciplinary or performance issues, "nothing happened." Pl. 56.1 ¶¶ 46, 47; Moss Decl. Ex. SS, TT, UU, WW. As a result, Plaintiffs contend that their efforts to direct and discipline the Room Attendants and Housemen were not taken seriously. Pl. 56.1 ¶ 46; Moss Decl. Ex. II ("If [the Room Attendants] feel like doing it, they will. If they don't feel like it, then there's nothing that we can do. . . . All I can do is call downstairs and tell [the Director].").

Finally, the parties dispute the role played by Plaintiffs in hiring or firing, and their input (if any) into these processes. Def. 56.1 ¶¶ 47, 52, 56; Pl. 56.1 ¶¶ 47, 52, 56. While Defendants contend that Plaintiffs interviewed candidates and provided feedback regarding possible offers of employment, Plaintiffs claim that they had virtually no role in interviewing, hiring, or firing, and their feedback was not used to terminate, demote, or promote any members of the staff. Pl. 56.1 ¶¶ 47, 52, 56.

### 4. Compensation of Employees in the Housekeeping Department

Although the record is incomplete on the subject of compensation, it does provide a sense of the relative compensation earned by the various employees in the housekeeping department. Thomas was hired as a Room Attendant in 2001 at a starting wage of $17.45 per hour, plus overtime. Moss Decl. Ex. UUU. Assuming Room Attendants worked a 40-hour week, with two weeks of unpaid vacation per year, this wage amounts to a baseline of $34,900 per year plus overtime. See Pl. Mem. at 13. When Thomas became an Office Coordinator in 2004, she earned $18.50 per hour, plus overtime. Moss Decl. Ex. UUU. Thomas testified that in her final year as

10

an Office Coordinator, her total compensation, including overtime, was $51,000.  Moss Decl. Ex.

UUU.  By contrast, when the department was restructured and Thomas became an Assistant

Housekeeping Manager in 2009, her income was reduced to $47,500 per year, without any

eligibility for overtime.  Moss. Decl. UUU.  The salaries of the Housekeeping Manager Plaintiffs

were lower, ranging from $43,412 to $45,975 per year.  Def. 56.1 ¶ 13; Moss Decl. Ex. TTT.

The Director, on the other hand, earned a salary of approximately $85,000 per year.  Moss Decl.

Ex. KKK.

**B.      Procedural History**

On October 7, 2010, Fazylova, Stanberry, Martinez, and Justiniano filed their Complaint

seeking unpaid overtime and "spread of hours" compensation.  (Dkt. No. 1).  On February 4,

2011, Plaintiffs filed an Amended Complaint adding Thomas as a Plaintiff.  (Dkt. No. 19).  On

March 23, 2012, after the close of discovery and an unsuccessful mediation, Defendants moved

for summary judgment, arguing that Plaintiffs were properly classified as exempt "executives"

within the meaning of the FLSA and NYLL, and therefore were not entitled to overtime or

"spread of hours" compensation.  See Memorandum of Law in Support of Defendants' Motion

for Summary Judgment ("Def. Mem.") at 4-19 (Dkt. No. 38).  In the alternative, Defendants

moved for partial summary judgment that the proper method for computing any overtime

compensation due to Plaintiffs is the Department of Labor's "half-time method," and separately

that Plaintiffs are not entitled to "spread of hours" compensation under NYLL.  Id. at 19-23.  On

April 27, 2012, Plaintiffs filed papers opposing each of these bases for summary judgment,

arguing, inter alia, that they were not exempt employees because their primary duty was cleaning

and their principal value to the Hotel was to reduce overtime compensation costs that otherwise

would have been paid to the unionized cleaning staff.  See Plaintiffs' Memorandum of Law in

11

Opposition to Defendants' Motion for Summary Judgment ("Pl. Mem.") at 5-16 (Dkt. No. 42).

Defendants filed a reply on May 18, 2012. See Reply Memorandum of Law in Support of

Defendants' Motion for Summary Judgment ("Def. Reply Mem.") (Dkt. No. 45).[10] The parties

have consented to have me preside over the case for all purposes under 28 U.S.C. § 636(c).

(Dkt. No. 24).

## II.   DISCUSSION

### A.   Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, a party may move for

summary judgment as to the entire case, or for "partial summary judgment on a claim or defense,

or on 'part of each claim or defense.'" Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens

Health Care, Inc., No. 09–CV–1410 (KAM) (RLM), 2012 WL 6091570, at *9 (E.D.N.Y. Dec. 7,

2012) (report and recommendation) (citing In re Ciprofloxacin Hydrochloride Antitrust Litig.,

261 F. Supp. 2d 188, 231 (E.D.N.Y. 2003) (Rule 56 "authorizes partial summary judgment that

falls short of a final determination to limit the issues to be determined at trial")).  Summary

judgment should be granted if the moving party can show, based on the depositions, documents,

affidavits, admissions, and other materials in the record, "that there is no genuine dispute as to

any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a),

(c)(1)(A).

"The function of the district court in considering the motion for summary judgment is not

to resolve disputed questions of fact but only to determine whether, as to any material issue, a

genuine factual dispute exists." Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010)

---

[10]      In their moving papers, Defendants also sought summary judgment that Interstate was not
a proper defendant, but they have withdrawn this argument in their reply papers.  Def. Reply
Mem. at 10 n.4.

(citation omitted); see also Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994) (court is confined to "issue-finding," not "issue-resolution"). "'A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d Cir. 2012) (quoting Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d 84, 94 (2d Cir. 2012)). In considering the evidence, a court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Hedlund v. N.Y.C. Transit Auth., No. 11-4861-cv, 2013 WL 48693, at *1 (2d Cir. Jan. 4, 2013) (citation omitted). "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006) (quoting Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997)).

The moving party bears the initial burden of establishing that there are no genuine issues of material fact for trial. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "If the movant meets its initial burden, the nonmoving party must then cite specific facts in the record to establish that there are material issues of fact requiring a trial." Quintero v. Rite Aid of New York, Inc., No. 09 Civ. 6084 (JLC), 2011 WL 5529818, at *4 (S.D.N.Y. Nov. 10, 2011) (citing Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir. 1998)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." Id. (citing Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315-16 (2d Cir. 2006)).

13

**B.    The Overtime Requirements of the FLSA and NYLL**

"The FLSA was enacted to eliminate 'labor conditions detrimental to the maintenance of

the minimum standard of living necessary for health, efficiency, and general well-being of

workers,' and to 'guarantee [ ] compensation for all work or employment engaged in by

employees covered by the Act.'" Havey v. Homebound Mortg., Inc., 547 F.3d 158, 160 (2d Cir.

2008) (quoting 29 U.S.C. § 202(a) and Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No.

123, 321 U.S. 590, 602 (1944)).  Subject to certain exceptions, the FLSA, and the analogous

provisions under NYLL, require that employees who work more than 40 hours per week be

compensated for overtime work at a rate of one and one-half times their regular rate of pay.  29

U.S.C. § 207(a)(1); N.Y. Labor Law § 650 et seq.; N.Y. Comp. Code R. & Regs. tit. 12, §§ 142-

2.2, 146-1.4.  Employees are exempt from the overtime provisions, however, if they are

"employed in a bona fide executive . . . capacity."  29 U.S.C. § 213(a)(1); see also NYLL

§ 651(5)(c); N.Y. Comp. Code R. & Regs. tit. 12, §§ 142-2.2, 142-2.14(c)(4), 146-3.2(c)(1).[11]

An employer seeking to rely upon an exemption as a defense to paying overtime bears

the burden of proving that such exemption applies.  McLean v. Garage Mgmt. Corp., 819 F.

Supp. 2d 332, 337 (S.D.N.Y. 2011) (citing Reiseck v. Univ. Comm. of Miami, Inc., 591 F.3d

101, 104 (2d Cir. 2010)).  "Because the FLSA is a remedial statute, its exemptions are construed

narrowly against the employer."  Kahn v. Superior Chicken & Ribs, Inc., 331 F. Supp. 2d 115,

117 (E.D.N.Y. 2004) (citing Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960); Martin v.

---

[11]    "Because New York's overtime provisions mirror and/or expressly adopt federal wage
law, federal courts evaluate New York's executive exemption by reference to the Fair Labor
Standards Act of 1938, 29 U.S.C. § 201 et seq., and its attendant regulations, set forth in the
Code of Federal Regulations."  Clougher v. Home Depot U.S.A., Inc., 696 F. Supp. 2d 285, 289
n.5 (E.D.N.Y. 2010) (citing N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2; Zheng v. Liberty
Apparel Co., 355 F.3d 61, 78 (2d Cir. 2003)); see also Ramos, 687 F.3d at 556 n.1 (declining to
engage in a separate analysis of NYLL claims because "like the FLSA, the NYLL 'mandates
overtime pay and applies the same exemptions as the FLSA'") (citation omitted).

Malcolm Pirnie, Inc., 949 F.2d 611, 614 (2d Cir. 1991)); see also Ramos, 687 F.3d at 558 ("'To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretive process and to frustrate the announced will of the people.'") (quoting A.H. Phillips, Inc. v. Walling, 324 U.S. 490, 493 (1945)).

Whether an exemption applies to a particular employee is a mixed question of law and fact. Ramos, 687 F.3d at 558 (citation omitted). "The question of how the [employees] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is question of law[.]" Id. (citing Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986)).

## C.  Summary Judgment is Denied on Plaintiffs' Overtime Claim

The FLSA does not define the term "bona fide executive" and instead directs the Secretary of Labor to do so by regulation. Ramos, 687 F.3d at 559 (citing 29 U.S.C. § 213(a)(1)). Regulations issued by the Department of Labor provide that the exempt or nonexempt status of an employee cannot be assessed from an employee's job title alone, but instead must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations. 29 C.F.R. § 541.2. The Department of Labor has defined an "employee employed in a bona fide executive capacity" as an employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

15

29 C.F.R. § 541.100(a).[12]  Courts analyze these criteria in terms of a "salary basis" component

and a "duties" component.  See, e.g., Rowe v. Olthof Funeral Home, Inc., No. 10-CV-6220T,

2011 WL 4899970, at *2 (W.D.N.Y. Oct. 13, 2011); McLean, 819 F. Supp. 2d at 337.  In this

case, there is no genuine dispute of fact that Plaintiffs' employment satisfied the "salary basis"

component of the exemption.  However, factual disputes regarding the nature and scope of

Plaintiffs' duties preclude a determination at this stage of the proceedings that Plaintiffs'

employment satisfied the "duties" component.

     1.    Plaintiffs Were Compensated on a "Salary Basis"

There is no genuine dispute that Plaintiffs were paid substantially more than $455 per

week.  Def. 56.1 ¶ 13; Moss Decl. Exs. TTT, UUU (weekly starting pay in relevant positions

ranged from $834.85 (Justiniano) to $913.46 (Thomas)).  However, Plaintiffs dispute whether

they were compensated on a "salary basis."  Pl. Mem. at 6-8.  Compensation is earned on a

"salary basis" "if the employee regularly receives each pay period on a weekly, or less frequent

basis, a predetermined amount constituting all or part of the employee's compensation, which

amount is not subject to reduction because of variations in the quality or quantity of the work

performed."  29 C.F.R. § 541.602.  Subject to enumerated exceptions, an exempt employee

generally "must receive the full salary for any week in which the employee performs any work

without regard to the number of days or hours worked."  Id.; see also Havey, 547 F.3d at 164

("[O]nce the fixed minimum portion of an employee's compensation has been determined, any

---

[12]    New York law mandates higher minimum weekly salaries than the FLSA and sets forth
additional duties-based criteria to qualify for the executive exemption.  See N.Y. Comp. Codes
R. & Regs. tit. 12, §§ 142-2.14(c)(4)(i)(e); 146-3.2(c)(1)(e) (minimum weekly salary ranged
from $506.25 to $543.75 for relevant time period).  However, as discussed below, there is no
genuine dispute that Plaintiffs' salary exceeded the minimum under both state and federal law,
and Defendants' motion is properly resolved under the FLSA and its attendant regulations,
without any need to examine the additional criteria set forth under New York law.

reduction below that set amount would, in most circumstances, violate the 'salary-basis test.'")
(citations omitted).

The regulation permits deductions from an exempt employee's pay, however, when the
employee "is absent from work for one or more full days for personal reasons, other than
sickness or disability," 29 C.F.R. § 541.602(b)(1), and "for unpaid disciplinary suspensions of
one or more full days imposed in good faith for infractions of workplace conduct rules . . .
pursuant to a written policy applicable to all employees." 29 C.F.R. § 541.602(b)(5).  In
addition, courts have determined that isolated deductions—even if improper under § 541.602—
do not necessarily mean that an employee is not paid on a "salary-basis." Instead, an employee's
exempt status is lost only "'if there is either an actual practice of making [improper] deductions
or an employment policy that creates a 'significant likelihood' of such deductions.'"  Anani v.
CVS RX Servs., Inc., 788 F. Supp. 2d 55, 64 (E.D.N.Y. 2011) (citing Auer v. Robbins, 519 U.S.
452, 461 (1997); Ahern v. Cnty of Nassau, 118 F.3d 118 (2d Cir. 1997)); see also Torres v.
Gristede's Operating Corp., 628 F. Supp. 2d 447, 456 (S.D.N.Y. 2008).  The overarching inquiry
is whether the employer's practices reflect an "objective intention to pay its employees on a
salaried basis." Yourman v. Giuliani, 229 F.3d 124, 130 (2d Cir. 2000) (citation and quotation
marks omitted).

In this case, Plaintiffs testified at their depositions that their salaries were accurate and
that they received a weekly paycheck consistent with these salaries.  Wexler Decl. Ex. J at 49,
Ex. M at 59-60, Ex. N. at 145-47.  However, Plaintiffs contend that their remuneration was not
earned on a "salary basis" because their paychecks were reduced on three instances for unpaid
disciplinary suspensions of one day, and on several other occasions, for absences that exceeded

their sick time and vacation allotments.  Pl. Mem. at 7.[13]  Plaintiffs also argue that "every time

Plaintiffs had disciplinary issues, they were threatened with suspension without pay," Pl. Mem.

at 7-8, and they cite to language inserted into the human resources department's corrective action

form that warned disciplined employees that "[f]ailure to improve will result in additional

disciplinary action, including but not limited to, suspension pending investigation and/or

termination."  Moss Decl. Ex. B.  In addition, Plaintiffs point to the fact that the Hotel's payroll

system assigned them hourly rates, which were used to compute salary deductions in eight-hour

increments for full-day absences and payouts for unused vacation time.  Pl. Mem. at 8; Moss

Decl. Exs. E, F, G.

These circumstances do not create a genuine dispute of fact that Plaintiffs were not

salaried employees.  As discussed, an employer may make deductions for full-day unpaid

disciplinary suspensions, imposed in good faith pursuant to formal written policy, without

jeopardizing an employee's exempt status.  See 29 C.F.R. § 541.602(b)(5).[14]  Plaintiffs concede

---

[13]    In particular, Fazylova was suspended for a full day without pay on March 18, 2008 as a
disciplinary measure after she purportedly signed off on a room her supervisor determined was
insufficiently clean.  Moss Decl. Ex. D.  Justiniano was suspended for a full day without pay on
January 8, 2010 as a disciplinary measure for switching her shift without obtaining prior
authorization from her supervisor.  Id.  Stanberry was suspended for a full day without pay for
"negligence and insubordination" when she allegedly called in sick in order to attend a funeral,
after having been advised by her supervisor that doing so would "put a strain on the department"
due to insufficient coverage.  Id.  The paychecks of Justiniano and Fazylova also were reduced
more than 30 times (collectively) between 2008 and 2010 for full-day absences when they had
no remaining sick time.  Moss Decl. Ex. G.

[14]    Citing Yourman, 229 F.3d at 128, Plaintiffs argue that "[d]eductions from pay in less
than one week increments for disciplinary violations are inconsistent with compensation on a
salary basis."  Pl. Mem. at 6-7.  However, the regulation on which Yourman relied, 29 C.F.R. §
541.118(a), was replaced in relevant part in 2004 by 29 C.F.R. § 541.602(b), which now permits
an employer to impose full-day unpaid disciplinary suspensions for less than a week without
jeopardizing an employee's salaried status.  See 69 Fed. Reg. 22122-01, 22176-77 (Apr. 23,
2004) ("The proposed subsection (b) . . . added a new exception to the salary basis rule for
deductions for 'unpaid disciplinary suspensions of a full day or more imposed in good faith for

that the three disciplinary-based deductions were made for full-day suspensions, Pl. Mem. at 7,

and the record reflects that such suspensions were imposed pursuant to formal written policy.

See Moss Decl. Ex. A at SUN 000909 (denoting "Progressive Discipline" section of employee

handbook); Wexler Decl. Ex. O at 105 (describing progressive discipline protocol). Even

allowing for disputes of fact as to whether the suspensions were made in good faith, three

suspensions among five employees over a period of four years is, in this case, too isolated an

occurrence to suggest Defendants had an "actual practice" of making unlawful deductions from

the Plaintiffs' salaries. See, e.g., Kelly v. City of New York, Nos. 91 Civ. 2567, 91 Civ. 7343,

91 Civ. 7755 (JFK), 2000 WL 1154062, at *10 (S.D.N.Y. Aug. 15, 2000) (citing cases in which

isolated deductions, even if improper, did not establish "actual practice" of making unlawful

deductions).

Similarly, with respect to the deductions for absences that exceeded Plaintiffs' vacation

allotments and sick time, an employer may properly reduce an exempt-employee's pay for full-

day absences occasioned by personal reasons other than sickness or disability. 29 C.F.R. §

541.602(b)(1). Although the record does not indicate the reasons for each of Fazylova's and

Justiniano's absences, it does demonstrate that these absences were excessive (collectively

exceeding 30 in a two-year span), and either were unexplained or were purportedly caused by

personal reasons such as the inability to secure childcare. See Moss Decl. Exs. B, G, GGG. This

evidence has not been challenged, refuted, or otherwise explained by Plaintiffs in a way that

would remove the pay deductions from the scope of permissible deductions under 29 C.F.R.

---

infractions of workplace conduct rules' . . . . The Department believes that this is a common-
sense change that will permit employers to hold exempt employees to the same standards of
conduct as that required of their nonexempt workforce [and] . . . it will avoid harsh treatment of
exempt employees—in the form of a full-week suspension—when a shorter suspension would be
appropriate.") (codified at 29 C.F.R. § 541.602(b)(5)).

§ 541.602(b)(5). Thus, the Court finds that there is no genuine dispute as to the propriety of the deductions occasioned by Fazylova's and Justiniano's full-day absences for "salary basis" purposes.

Nor does the boilerplate warning in the Hotel's corrective action form suggest that the Hotel had either an "actual practice" of making improper deductions, or a policy creating a "significant likelihood" that improper deductions would be made. The language cited by Plaintiffs does not threaten employees with pay reductions based on the quality or quantity of work performed; it reasonably warns employees that a failure to correct the disciplinary or performance issue could result in suspension and/or termination. There is no indication that Plaintiffs interpreted this language as a threat to reduce their pay, and—the single disciplinary suspension of Fazylova aside—nothing to suggest that Defendants docked (or threatened to dock) Plaintiffs' pay based on how many rooms they inspected or how well they inspected such rooms.

Finally, courts generally have rejected the proposition that an employer's reference to hourly rates in payroll statements affects an employee's status as a salaried employee. See, e.g., Levine v. Unity Health Sys., 847 F. Supp. 2d 507, 509-10 (W.D.N.Y. 2012) (no question of fact that plaintiffs were paid on a salary basis despite employer's "use of potentially confusing references to an 'hourly rate' in its payroll statements"); Wright v. Aargo Sec. Servs., Inc., No. 99 Civ. 9115 (CSH), 2001 WL 91705, at *7 (S.D.N.Y. Feb. 2, 2001) ("A payroll accounting system which calculates an exempt employee[']s pay on an hourly basis does not indicate that the employee was not salaried[.]") (citing cases) (internal punctuation omitted). Accordingly, I find that Plaintiffs' compensation satisfied the "salary basis" test as a matter of law.

20

2.      Disputed Fact Questions Preclude Summary Judgment That Plaintiffs' Duties
Satisfy the Executive Exemption

Defendants also must establish that Plaintiffs' duties satisfy each of the three "duties"

criteria of 29 C.F.R. § 541.100(a) as follows:  (1) Plaintiffs' "primary duty" was management of

the enterprise in which they were employed or of a customarily recognized department or

subdivisions thereof; (2) Plaintiffs "customarily and regularly" directed the work of two or more

other employees; and (3) Plaintiffs either had "the authority to hire or fire other employees" or

their "suggestions and recommendations as to the hiring, firing, advancement, promotion or any

other change of status of other employees [were] given particular weight." 29 C.F.R. §

541.100(a)(2)-(4).  "Consideration of these factors is a highly fact-intensive inquiry, to be made

on a case-by-case basis in light of the totality of the circumstances." Clougher, 696 F. Supp. 2d

at 290 (citations and quotation marks omitted).

a.      Whether Management Was Plaintiffs' "Primary Duty"

An employee's "primary duty" is the "principal, main, major or most important duty that

the employee performs." 29 C.F.R. § 541.700(a).  It must be assessed based on all of the facts

"with the major emphasis on the character of the employee's job as a whole." Id.  Relevant

factors are: "the relative importance of the exempt duties as compared with other types of duties;

the amount of time spent performing exempt work; the employee's relative freedom from direct

supervision; and the relationship between the employee's salary and the wages paid to other

employees for the kind of nonexempt work performed by the employee." Id. [15]

---

[15]      The Department of Labor has set forth a non-exhaustive list of activities that constitute
"management."  Such activities include:

> interviewing, selecting, and training of employees; setting and adjusting their
> rates of pay and hours of work; directing the work of employees; maintaining
> production or sales records for use in supervision or control; appraising

Although the percentage of an employee's time spent performing exempt versus nonexempt work is an "important" factor, it is not dispositive. See, e.g., Scott v. SSP America, Inc., No. 09–CV–4399 (RRM) (VVP), 2011 WL 1204406, at *8 (E.D.N.Y. Mar. 29, 2011) (crediting plaintiff's testimony that she spent 90 percent of her time performing nonexempt tasks but finding exempt work more important to success of defendant's business) (citing Dalheim v. KDFW–TV, 918 F.2d 1220, 1227 (5th Cir. 1990) ("'employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time'")). Thus, Defendants are correct that the percentage of time Plaintiffs spent cleaning—even if it was as high as 80 percent, as Plaintiffs suggest—is not dispositive of whether they were exempt employees because "an employee's 'primary duty' is not necessarily her most time consuming task." (Pl. Mem. at 10). Nevertheless, "exempt executives [generally] make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work," whereas a "nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined periods." 29 C.F.R. § 541.106(a). Thus, the amount of time that Housekeeping Managers devoted to cleaning, and who decided how they should allocate their time between cleaning and their

---

employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

purportedly managerial functions, are highly relevant to determining which aspect of their job was most important to the Hotel's operations.

In this case, there are too many factual disputes—regarding how Plaintiffs allocated their time and under whose direction; the proper characterization of Plaintiffs' various responsibilities; and the relative import of such responsibilities to the Hotel—for the Court to conclude, as a matter of law, that management was Plaintiffs' "primary duty." While the parties agree that Plaintiffs inspected the work of the Room Attendants, gathered supplies from the supply closet, printed and distributed assignments, and convened pre-shift "daily huddles," they dispute whether—and the degree to which—Plaintiffs actually assigned work to the cleaning staff themselves (as opposed to distributing assignments made by their supervisor); initiated overtime; arranged coverage for absent cleaning staff; handled budgetary and payroll matters; purchased supplies; evaluated, coached, or trained the cleaning staff; possessed meaningful authority to direct and discipline the Room Attendants and Housemen; and participated in hiring and firing members of the cleaning staff. Selecting which of these different depictions of Plaintiffs' responsibilities to credit is a task for the jury, not the Court.[16]

---

[16]     Plaintiffs' contentions that they did not perform certain duties are, to a certain extent, inconsistent with some of their résumés. Wexler Decl. Exs. D, EE. However, the résumés on file with the Court are expressly contradicted and/or qualified by the deposition testimony on record, creating a question of fact for the jury. See, e.g., Moss Decl. Exs. II, NN, BBB; Wexler Decl. Ex. J at 208. In any case, the résumés are not dispositive of whether management was Plaintiffs' "primary duty" because "the determination of whether or not an employee qualifies as [exempt] under the regulations . . . 'focus[es] on evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in résumés, position descriptions, and performance evaluations.'" Rowe, 2011 WL 4899970, at *3 (citations omitted); see also Perkins v. Southern New England Telephone Co., 669 F. Supp. 2d 212, 219 n.3 (D. Conn. 2009) ("'[W]hether an employee is covered by an exemption to the FLSA overtime requirements does not depend on an employee's general characterization of his or her job in a résumé designed to enhance the employee's duties and responsibilities to obtain a job. . . . What is important is what an employee actually does on a day-to-day basis.'") (quoting Ale v. TVA, 269 F.3d 680, 688 (6th Cir. 2001)).

Further, while the parties agree that a major component of Plaintiffs' duties was inspecting the work of the Room Attendants, they dispute whether the purpose of Plaintiffs' inspection duties was to "coach and train" Room Attendants, or simply to finish cleaning the rooms so the Room Attendants did not have to work overtime. Although Defendants are correct that if Plaintiffs had simply "chose[n] to assign some [nonexempt] tasks . . . to themselves rather than the Room Attendants or Housemen," it would not necessarily "undercut their discretion as managers to make that choice," Def. Mem. at 16, this argument ignores Plaintiffs' assertion that they had <u>no</u> choice due to the Hotel's expressed desire to avoid paying overtime and the pressure not to "drop" rooms at the end of their shift. See Pl. Mem. at 9-10; Moss Decl. Ex. P. Given the expectation that Room Attendants would clean 14 rooms per shift, a jury could find that calling back the Room Attendants to finish cleaning a room was not realistic or compatible with Plaintiffs' responsibility to ensure that their sections were cleaned before the end of the workday. A jury also could credit Plaintiffs' testimony that they were specifically instructed by their supervisor to clean the rooms themselves, and thus did not, in fact, have discretion as to whether to perform such work.

Also relevant to the consideration of whether Plaintiffs' "primary duty" was management is the relationship between their salaries and the wages paid to other employees for the kind of nonexempt work Plaintiffs performed. See 29 C.F.R. § 541.700(a). As Plaintiffs point out, their salaries (ranging from $43,412 to $47,500) were more comparable to the compensation earned by the nonexempt Room Attendants ($34,900 per year before overtime) than to the salary earned by the exempt Housekeeping Director ($85,000 per year). Likewise, Defendants classified Office Coordinators as nonexempt—even though Office Coordinators performed work that Defendants now characterize as managerial (such as printing assignments, assisting with payroll,

24

and purchasing supplies)—yet allegedly paid Thomas more as an Office Coordinator ($51,000 per year with overtime) than as an exempt Assistant Housekeeping Manager ($47,500 per year). This evidence supports Plaintiffs' contention that their "true value [to the Hotel] was saving . . . payroll hours." (Pl. Mem. at 9) (citing Johnson v. Big Lots Stores, Inc., 604 F. Supp. 2d 903, 916, 917 (E.D. La. 2009) and Clougher, 696 F. Supp. 2d at 291-92). Given the disputed fact issues underlying an assessment of Plaintiffs' "true value" to the Hotel, as well as the fact issues of credibility may be involved in resolving them, summary judgment is improper. See, e.g., Rubery v. Buth-Na-Bodhaige, Inc., 470 F. Supp. 2d 273, 276-77 (W.D.N.Y. 2007) (summary judgment denied where employee testified she spent up to 90 percent of time performing nonexempt work, was largely controlled by a supervisor, lacked discretion to resolve issues in her store, did not interview, hire or fire employees, and that exempt tasks she performed were also performed by nonexempt employees).

Defendants cite King v. Windsor Capital Grp. Inc., 178 N.C. App. 669 (N.C. Ct. App. 2006)—which they contend is a "strikingly similar case"—for the proposition that summary judgment is proper in this case. Def. Mem. at 15. King involved a manager in a hotel's housekeeping services department, and it is undisputed that the manager had substantially greater managerial responsibilities than even Defendants allege that Plaintiffs had here. The King plaintiff, who was one of eight managers working under the hotel's general manager, regularly supervised the entire hotel; was provided with an office to perform her duties; made the weekly schedule for her subordinates without the approval of the general manager; and had the authority to fire employees, approve leave time, resolve guest complaints, handle employee disciplinary matters, conduct performance reviews, and make hiring recommendations. Id. at 670. Moreover, the King plaintiff testified in her deposition "that she supervised twenty-five

25

employees, including three mid-level supervisors, and was 'in charge of the back of the house: housekeeping, public area, turndown service.' She was <u>solely</u> responsible for scheduling the staff performing those services[.]" <u>Id.</u> at 676 (emphasis added).  Although the <u>King</u> plaintiff also spent 50-80 percent of her time performing manual labor and other nonmanagerial duties in conjunction with her managerial work, the court held that the evidence led "to only one conclusion:  the hotel could not function without plaintiff's performing her managerial responsibilities." <u>Id.</u> at 676.

In this case, by contrast, the parties dispute whether Plaintiffs performed many of the managerial responsibilities undertaken by the plaintiff in <u>King</u>, making summary judgment inappropriate.  Moreover, the Hotel's decision to replace the non-exempt Office Coordinator position with the exempt Assistant Housekeeping Manager position, in order to "eliminate overtime" and put "more people on the floors," Moss Decl. Ex. QQQ, suggests that, unlike the employer in <u>King</u>, Defendants could have functioned without Plaintiffs performing the purportedly managerial functions previously undertaken by the Office Coordinators, but could not have functioned had Plaintiffs ceased to perform their cleaning responsibilities.  When asked to describe the responsibilities of Housekeeping Managers and Assistant Housekeeping Managers, the general manager of operations at the Hotel responded:  "To be up on the floor, work with the team members, room attendants, housemen.  <u>Getting the rooms cleaned and available to guests</u>." Moss Decl. Ex. RRR (emphasis added).  Thus, unlike in <u>King</u>, a reasonable jury could find that cleaning, not management, was Plaintiffs' principal value to the Hotel.[17]

---

[17]    Defendants cite a number of other cases to support their contention that summary judgment is proper on this point. Def. Mem. at 14 & n.3.  However, if the Court credits Plaintiffs' version of the facts, as it must on this motion, Housekeeping Managers did not exercise the same degree of managerial authority and discretion as the employees in those cases.

> b.   Whether Plaintiffs "Customarily and Regularly" Directed the Work of the Room Attendants and Housemen

The second criterion of the "duties" test—that an exempt employee "customarily and regularly" directs the work of two or more employees—also cannot be resolved on summary judgment because the extent of Plaintiffs' authority over the Room Attendants and Housemen is disputed.  Under Plaintiffs' version of the facts, they did not assign work to the cleaning staff, had little to no discretion in determining how or when work was to be performed, and little opportunity, as a practical matter, to improve the performance or productivity of the cleaning staff, given their limited disciplinary authority over such employees.  Pl. 56.1 ¶¶ 23, 30, 46, 47.  Plaintiffs contend that Room Attendants could refuse their directions and go above their heads to their supervisor.  Pl. 56.1 ¶¶ 46, 47; Moss Decl. Exs. I, II.  Moreover, Plaintiffs contend that they were specifically instructed by their supervisor "not to bother the Room Attendants too much."  Pl. 56.1 ¶ 38.  A jury could credit this evidence and conclude that Plaintiffs had little "meaningful supervisory authority over" the Room Attendants and Housemen, Pl. Mem. at 15, and therefore did not "customarily and regularly direct" the work of such employees within the meaning of § 541.100(a)(3).

> c.   Whether Plaintiffs Had Hiring and Firing Authority

The final element of the "duties" test is whether Plaintiffs "ha[d] the authority to hire or fire other employees" or whether their "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. § 541.100(a)(4).  Defendants do not suggest that Plaintiffs had the authority to hire or fire other employees, and there is no genuine dispute that Plaintiffs did not have such

---

Moreover, one of the cases, Donovan v. Burger King Corp., 675 F.2d 516 (2d Cir. 1982), was resolved at trial, not on summary judgment.

authority. See Wexler Decl. Ex. O at 105. The parties dispute, however, whether Plaintiffs'
"suggestions and recommendations" as to the hiring, firing, advancement, or promotion of the
line employees were given "particular weight." Plaintiffs assert that their input regarding the
Room Attendants was not taken seriously, Pl. 56.1 ¶ 46; Moss Decl. Exs. SS, TT, UU, and there
do not appear to be any examples in the record in which Plaintiffs' input was used as a basis to
either fire or promote any employee. There is testimony that some of the Plaintiffs may have
provided input into the hiring of a single Houseman sometime in 2010. Wexler Decl. Ex. O at
66, 69. However, the general manager of the Hotel could not recall when any of the Plaintiffs
had attended housekeeping department interviews, how often, whether they had asked any
questions, or given any particular input. Wexler Dec. Ex. F at 26-28. Thus, the Court cannot
conclude on the present record that this element of the exemption is met.[18]

In sum, the numerous factual disputes in the record preclude a finding that Plaintiffs'
employment satisfied the "duties" test as a matter of law. See, e.g., Hernandez v. MB Florida
Ltd., No. 11-24642-CIV, 2012 WL 3848556, at *1-4 (S.D. Fla. Sept. 25, 2012) (denying
defendant hotel's motion for summary judgment in analogous case where housekeeping
employee denied she supervised or trained other employees, interviewed job applicants, or
influenced who was hired or fired). Accordingly, Defendants' motion for summary judgment is
denied on Plaintiffs' overtime claim.

---

[18]     Defendants argue that simply having the authority to initiate the disciplinary process is
sufficient to satisfy the final element of the "duties" test. Def. Mem. at 19. However, in each of
Defendants' cited cases, the employee had authority or influence that resulted in a change of
status for the affected subordinate. Therefore, the Court is not persuaded that simply having the
authority to initiate disciplinary proceedings is sufficient to satisfy § 541.100(a)(4), especially on
a motion for summary judgment.

**D.      Disputed Fact Issues Exist as to Whether Overtime Should Be Calculated According to the Half-Time Method**

Defendants move, in the alternative, for partial summary judgment on the proper methodology for calculating the payment of overtime compensation. "Under the FLSA, the standard method of calculating overtime pay for salaried employees is to determine the regular hourly rate of pay by dividing the salary by the number of hours which the salary is intended to compensate; the employee then receives one and one-half times that regular rate of pay for all hours worked in excess of forty per week." Davis v. Abercrombie & Fitch Co., No. 08 Civ. 1859 (PKC), 2008 WL 4702840, at *7 (S.D.N.Y. Oct. 23, 2008) (citing 29 C.F.R. § 778.113; Adams v. Dep't of Juvenile Justice, 143 F.3d 61, 66-67 (2d Cir. 1998)); see also 29 U.S.C. § 207(a)(1) (overtime must be paid at "a rate not less than one and one-half times the regular rate at which [the employee] is employed").

However, in Overnight Motor Transportation Co. v. Missel, the Supreme Court held that where an "employment contract is for a weekly wage with variable or fluctuating hours," the employee's "regular rate" is the quotient of the weekly salary divided by the actual number of hours worked, rather than by a set number of hours, as contemplated by the standard method. 316 U.S. 572, 580 (1942). Missel subsequently gave rise to what has come to be known as the "half time" or "fluctuating work-week" ("FWW") method of computing overtime pay. "Under this method, the regular hourly rate is determined by dividing the fixed weekly salary by the number of hours the employee actually works in a particular week; the employee then receives one-half his or her regular rate of pay for all hours worked over forty per week." Davis, 2008 WL 4702840, at *7 (citing Boekemeier v. Fourth Universalist Soc'y, 86 F. Supp. 2d 280, 289-90 (S.D.N.Y. 2000)). "The rationale is that '[p]ayment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already

been compensated at the straight time regular rate, under the salary arrangement.'" Kadden v.

VisuaLex, LLC, No. 11 Civ. 4892 (SAS), 2012 WL 4354781, at *8 (S.D.N.Y. Sept. 24, 2012)

(citing 29 C.F.R. § 778.114(a)). "This method is an exception to the normal rights of the

employee and thus the employer bears the burden of proving that all the requirements for

applying the method are present." Dingwall v. Friedman Fisher Assoc., P.C., 3 F. Supp. 2d 215,

221 (N.D.N.Y. 1998) (citation omitted).[19]

　　　The Department of Labor has issued an interpretive rule on the FWW concept articulated

in Missel.  The rule limits the application of the FWW method to employment agreements under

which, inter alia, (1) "there is a clear mutual understanding of the parties that the fixed salary is

compensation (apart from overtime premiums) for the hours worked each workweek, whatever

their number, rather than for working 40 hours or some other fixed weekly work period"; (2)

"the amount of the salary is sufficient to provide compensation to the employee at a rate not less

than the applicable minimum wage rate for every hour worked"; and (3) the employee "receives

extra compensation, in addition to such salary, for all overtime hours worked at a rate not less

than one-half his regular rate of pay." 29 C.F.R. § 778.114(a).  Because § 778.114 was issued by

---

[19]　　　The difference between the standard method and FWW method for calculating overtime
is substantial, as illustrated by the hypothetical scenario discussed in the recent case of Hasan v.
GPM Inv., LLC, No. 3:07cv1779 (SRU), 2012 WL 3725693, at *2 (D. Conn. Aug. 27, 2012).
As the court observed in Hasan, an employee working 60 hours per week at a fixed weekly
salary of $1200 per week would be entitled to receive $900 per week in additional overtime pay
under the standard method, but only $200 under the FWW method. Id.  Under the standard
method, the employee's weekly rate of $1200 is divided by 40 to yield a regular rate of $30/hour.
Since the employer has not compensated the employee for any hours in excess of 40,
compensation is due for 20 hours at the rate of $45 per hour, or a total of $900.  Under the FWW
method, the employee's weekly rate of $1200 is divided by 60, to yield a regular rate of $20 per
hour. The employee has already been compensated at the straight time rate for all hours worked;
thus, the employee receives only half of his regular rate for the overtime hours, which is 20 hours
at $10 per hour, or $200. "This math adds up to a perverse incentive—'the longer the hours the
less the rate of pay per hour.'" Id. (quoting Missel, 316 U.S. at 580).

the Department of Labor as an interpretive bulletin, however, rather than pursuant to formal notice and comment rulemaking procedures, some courts have declined to afford it deference. See, e.g., Urnikis-Negro v. Am. Family Prop. Servs., 616 F.3d 665, 676 (7th Cir. 2010) (while "entitled to a 'measure of respect' from the judiciary," § 778.114 is not entitled to full deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)) (citing cases permitting application of the FWW method to employment arrangements not in conformity with § 778.114). Nevertheless, courts agree that the FWW method may not be used unless the employer and employee had a "clear mutual understanding" that a fixed salary was intended to compensate the employee for all hours worked. See, e.g., id. at 678 (citing cases); Clements v. Serco, Inc., 530 F.3d 1224, 1230 (10th Cir. 2008).[20]

Whether the parties had such a "clear mutual understanding" is an issue of fact, Urnikis-Negro, 616 F.3d at 680-81, and in this case, it is disputed. Defendants argue that each of the Plaintiffs "admitted that she was compensated on a salary basis and that her weekly compensation was intended to cover all hours she worked in a given week." Def. Reply Mem. at 8. However, while Fazylova, Martinez, Justiniano, and Stanberry each testified consistently with a general understanding that their salaries were fixed, it is not clear they understood or agreed that their fixed salary was intended to compensate them for hours in excess of 40. Plaintiffs' employment letters say nothing about the hours they would be called upon to work, and Stanberry testified that she understood her salary "was based on a 40-hour week" and did not know what the term "exempt" in her employment letter meant. Wexler Decl. Ex. M at 59-60. Nor have Defendants demonstrated that Plaintiffs regularly worked more than 40 hours per week

---

[20]    Walling v. A. H. Belo Corp., 316 U.S. 624 (1942), which Plaintiffs cite at page 19 of their memorandum of law, is consistent with this articulation of the rule. The Walling court made clear that the central question in determining an employee's "regular rate" is what the employee and employer have agreed upon in terms of compensation. 316 U.S. at 634.

when they received their offers of employment from Sunstone in 2006, such that they implicitly understood or agreed that their hours might exceed 40 but their pay would remain the same. To the contrary, the evidence in the record suggests that Plaintiffs' hours may have increased unexpectedly sometime in or after 2008. Moss Decl. Ex. P (Fazylova testifying that, in 2009, "there was a huge problem when [the Room Attendants] start dropping a lot of rooms"); Wexler Decl. Ex. J at 225 (Justiniano testifying that, starting in 2009, "[i]t was so much work, so many hours, I couldn't even get up to go to work. . . . We were short. We didn't have enough managers."). In fact, the record suggests even Defendants intended Plaintiffs' salary to cover, at most, 50 hours per week. See Moss. Decl. Ex. A at SUN 1005 (Interstate Hotels & Resorts Job Description stating Housekeeping Manager position entailed 40-50 hours per week).[21] Thus, there is a genuine factual dispute as to whether the parties had a "clear mutual understanding" that a Housekeeping Manager's fixed salary was intended to compensate for hours in excess of 40 per week. See, e.g., Berrios v. Nicholas Zito Racing Stable, Inc., 849 F. Supp. 2d 372, 395 (E.D.N.Y. 2012) (summary judgment denied as to FWW method where defendants failed to overcome "presumption that a weekly salary represents compensation for the first 40 hours of an employee's workweek"); Dingwall, 3 F. Supp. 2d at 221 (defendants failed to show FWW method was proper where employee manuals stated that "'[s]taff personnel are normally expected to work a 40 hour week'").

Only Thomas, who was an overtime-eligible Office Coordinator until that position was cut and she became an exempt Assistant Manager, testified to receiving clear notice that she would "not be eligible for overtime pay" in her new position. Wexler Decl. Ex. N at 145. However, like the other Plaintiffs, it is not clear that Thomas understood her new position would

---

[21]     There is no indication that Plaintiffs ever saw this job description prior this case. See, e.g., Wexler Decl. Ex. J at 208).

require her to work more than 40 hours per week.  More importantly, Thomas was informed that she would not be eligible for overtime in her new position during a meeting in which she testified to having been "presented a paper and told that they are going to phase out [the position of] Office Coordinator and I have to decide here and now to accept the Assistant Manager position or I was offered a severance pay."  Id. at 135.  Given Thomas' previous eligibility for overtime as an Office Coordinator, and the unilateral nature of the decision to change her compensation, it is not clear as a matter of law that Thomas had a "clear, mutual understanding" that her salary was intended to compensate her for all hours worked.  See Kadden, 2012 WL 4354781, at *12 (declining to apply FWW method where employee had originally been entitled to receive overtime, and although she "may have understood, when [her employer] informed her that she would no longer receive overtime, that her $75,000 salary would not change regardless of how many hours she worked[,] . . . in light of the original agreement . . . and the unilateral nature of the decision to change the compensation, it cannot be said that there was a 'clear mutual understanding'").  Accordingly, as Defendants have not demonstrated that Plaintiffs had a "clear mutual understanding" that their salaries were intended to compensate them for hours in excess of 40 per week, Defendants' request for partial summary judgment on the FWW or half-time method is denied.

### E.   Summary Judgment is Granted on the Spread of Hours Claim as to Fazylova, Stanberry, and Justiniano

Count 3 of the Amended Complaint seeks "spread of hours" compensation under New York law.  Am. Compl. ¶¶ 51-58.  Defendants argue that the "spread of hours" requirement under New York law only applies to employees receiving at or near the minimum wage, and because there is no genuine dispute that Plaintiffs received substantially more than the minimum

wage, they are not entitled to recover "spread of hours" compensation. Def. Mem. at 22-23. As to Plaintiffs' work prior to January 1, 2011, the Court agrees.

The "spread of hours" under New York law refers to "the interval between the beginning and end of an employee's workday." N.Y. Comp. Codes R. & Regs. tit 12, § 142-2.18. As of January 1, 2011, New York law provides that a non-exempt hotel "employee shall receive one additional hour of pay at the basic minimum hourly rate" for any day in which the spread of hours exceeds ten hours . . . regardless of a given employee's regular rate of pay." N.Y. Comp. Codes R. & Regs. tit 12, §146-1.6; see also §§ 146-1.1, 146-3.1. However, regulations in effect prior to January 1, 2011, stated that non-exempt hotel employees were only entitled to "receive one hour's pay at the basic minimum hourly wage rate . . . in addition to the minimum wages otherwise required" for "spread of hours" work. N.Y. Comp. Codes R. & Regs. tit 12, § 138-2.6 (2009); see also § 142-2.4. The New York State Department of Labor has issued opinion letters concluding that the "spread of hours" provisions in effect prior to 2011 did not apply to employees whose aggregate pay for "spread of hours" work exceeded the minimum wage plus an additional hour of pay at the minimum wage. See N.Y.S. Dep't of Labor opinion letter dated Mar. 16, 2007, file no. RO-07-0009, at 1 ("If . . . the employee's regular wages for [spread of hours work] is equal to or greater than [the minimum wage for such hours together with an additional hour of pay at the minimum wage], no additional wages need be paid."); N.Y.S. Dep't of Labor opinion letter dated Apr. 12, 2006, file no. RO-06-0027, at 2 ("[T]he spread of hours regulation does not require all employees to be paid for an additional hour, but merely that the total wages paid be equal to or greater than the total due for all hours at the minimum wage plus one additional hour at the minimum wage.").

The majority of the district courts in this Circuit have concurred with the New York Department of Labor and ruled that the spread of hours provision applicable to hotel employees prior to January 1, 2011 applied only to employees earning minimum wage. See, e.g., Li Ping Fu v. Pop Art Int'l Inc., 10 Civ. 8562 (DLC) (AJP), 2011 WL 4552436, at *6 (S.D.N.Y. Sept. 19, 2011) (citing cases), adopted as modified on other grounds, 2011 WL 6092309 (S.D.N.Y. Dec. 7, 2011); Rui Xiang Huang v. J & A Entm't Inc., No. 09-CV-5587 (ARR) (VVP), 2012 WL 6863918, at *8 (E.D.N.Y. Dec. 3, 2012) ("The majority of district courts in this circuit are in accord with the New York Department of Labor's position that those earning more than the minimum wage are not entitled to spread-of-hours pay.") (citations omitted); Zubair v. EnTech Eng'g P.C., 808 F. Supp. 2d 592, 601 (S.D.N.Y. 2011) ("[T]he explicit reference to 'minimum wage' in § 142-2.4 indicates that such a provision is properly limited to those employees who receive only the minimum compensation required by law."); Espinosa v. Delgado Travel Agency, Inc., No. 05 Civ. 6917 (SAS), 2007 WL 656271, at *2 (S.D.N.Y. Mar. 2, 2007) ("By its plain language section 142-2.4(a) only provides supplemental wages to workers who are paid the minimum wage required under New York law.  It does not ensure additional compensation to employees whose wages sufficiently exceed that floor."); but see Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327, 339-40 (S.D.N.Y. 2005) (declining to defer to Department of Labor's position and holding spread of hours protection applied to employee earning more than minimum wage).

This Court finds the majority view persuasive and adopts it as to Plaintiffs' pre-2011 employment.  See Roach v. T.L. Cannon Corp., No. 3:10-CV-0591 (TJM) (DEP), 2012 WL 3686004, at *3 (N.D.N.Y. Aug. 24, 2012) (granting summary judgment for defendants on restaurant workers' pre-2011 "spread of hours" claims).  Accordingly, partial summary judgment

on the spread of hours claim is granted as to Fazylova, Stanberry, and Justiniano, who each ceased working for the Hotel in 2010, and as to Thomas and Martinez for work performed prior to 2011. However, as of January 1, 2011, non-exempt hotel workers are entitled to receive "spread of hours" compensation regardless of their rate of pay. New York Code R. & Regs. 146-1.6. Therefore, summary judgment on the spread of hours claim is denied with respect to any work performed by Thomas and Martinez after January 1, 2011.

### III.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is denied. Their motion for partial summary judgment is granted as to Plaintiffs Justiniano, Favylova, and Stanberry, and in part as to Thomas and Martinez, on count 3 of the Amended Complaint, and is otherwise denied.

The parties are directed to appear for a status conference on April 2, 2013 at 11:30 a.m. in Courtroom 18-A, United States Courthouse, 500 Pearl Street, New York, New York to set a trial date and to discuss the possibility of further mediation before Magistrate Judge Freeman.

**SO ORDERED.**

Dated: New York, New York
      March 15, 2013

JAMES L. COTT
United States Magistrate Judge